## THE JOHN J. TUCKER.

### THE SOCONY NO. 9.

### THE SOCONY III.
#### Nos. A—17810, A—17876.

District Court, E. D. New York.
March 22, 1947.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan and Vincent J. Dunn, both of New York City, of counsel), for Mary Tucker.

John W. Knox, of New York City, for Socony-Vacuum Oil Co., Inc.

BYERS, District Judge.

A collision occurred in the Arthur Kill between the wooden Diesel tug John J. Tucker and the barge Socony 111 about 200 feet northeast of Buoy No. 4 at about 11:55 P.M. on the night of December 18, 1944, which gave rise to these two causes.

In the first, the owner of the tug seeks to recover for its damages; and in the second, the owner of the barge seeks redress from the tug.

The steel barge Socony 111 was in tow of the steam-tug Socony 9, being made fast, bow foremost, on the tug's starboard side; the sterns were flush and the barge extended about 150 feet forward of the tug's bow.

The dimensions of these vessels are: As to the tug, 100' by 24.1' with 12.3' depth of sides, and indicated horse power of 850; and as to the barge, which had a shovel-nosed bow, 251.5' by 40.1' with 12.7' depth of sides.

The barge was carrying 4,000 barrels of gasoline in bulk in tanks 5 and 6, and as laden, her draft was from 7 to 8' aft, and she was light at the bow, namely, her bow rode as high as though she were light.

After leaving the Shell Oil Dock, the tow straightened away to proceed northerly in the Arthur Kill, being bound for Bayway, New Jersey.

The dimensions of the Diesel tug Tucker are 80.3' at water-line, 90' overall, by 20.1', with a depth of 10.3' and indicated horse power of 450.

She had alongside to her own port the steel barge L.T.C. No. 7, which was light, and the dimensions of which are 200.5' by 38.2' with 12.9' sides; the bow of the barge extended from 113' to 115' ahead of the stem of the tug. That tow was bound down the Kill to Sewaren, New Jersey.

It was agreed that the tide was the end of flood, that is to say, nearly slack, but if there was any movement, it was up the Kill; that weather conditions did not affect visibility, which was good for about two miles; there was no moon; the sky was overcast, and the wind blew out of the northeast, of a force of about 30 miles.

It was also agreed that both tugs and barges carried proper lights, which were showing.

For the Tucker, the testimony is that the tow was proceeding at about the Staten Island edge of the channel, which means that it was at all times on the wrong side of the channel, including the point of collision. The Tucker was guilty of other faults, and nothing is urged for her, save that this is a half damage case.

Against the Socony 9, it is urged that her failure to blow an alarm is the only subject which requires attention, and the causes will proceed to decision on that understanding, although the fault is not pleaded either in the libel in the first cause or in the answer of the second.

The chart in evidence discloses that from a point about 1300' north of the Shell Oil Dock the channel begins a gradual curve to the right, ending off Port Reading, of approximately 90°. It became necessary for the Socony tow to begin to incline to her starboard hand or toward the Staten Island shore, when about off Buoy 6 (No. 6 Tucker Ex. 1), in order to round Buoy No. 4 and continue in the channel according to the course of the Kill.

The narratives of Captains Frantz of the Socony 9 and Colligan of the Tucker are not wholly inconsistent one with the other, except as to the position of the Tucker and her tow when she was first observed from the Socony 9 when the latter was near Lightbuoy No. 6, and that is an important element in the situation. Frantz says that the Tucker at that time was a little to the easterly of Lightbuoy No. 7 (No. 7 Tucker Ex. 1), and not only on her own side of the channel but actually closer to the New Jersey shore than circumstances would seem to warrant. Since the Tucker's barge was light and the tug herself did not draw more than 9 feet, there was sufficient depth outside the channel to admit of the presence of this tow where Frantz placed it. Due to the Tucker's heading, of course she showed only her red light to Frantz at the time of which he speaks; he says that thereafter the Tucker tow changed her course abruptly and shot across the waters of the Kill to the Staten Island side of the channel, opening her green light to the Socony 9 when the latter was about 300 feet below Buoy No. 4.

It should be said that each Captain puts his speed at about 6 miles an hour; the Socony tow having whatever tide there was, under foot, and the Tucker tow having to breast it but being aided by the northeasterly wind; this means that they approached at about 1200 feet a minute or 20 feet a second.

For the Tucker, her Captain says that he first observed the upbound tow when it was off the Shell Oil Dock at Sewaren, and then that it headed upstream; that he heard no signals and blew none, and as the tows approached the Socony 9 made a hard right turn when the Tucker was about 150 feet above Buoy No. 4, and the Socony 9 was only about 200 feet away; upon observing that swing, Colligan rang for full astern and made his prompt escape from the pilot-house as he realized that a collision was inevitable.

He says that he heard three blasts from the Socony 9 just after the above swing was made, and that the collision took place at the place stated; and that the barge Socony 111 struck the Tucker tug on its starboard quarter, doing the damage complained of.

Whether Colligan is right in saying that he was at all times close to the Staten Island edge of the channel is important in connection with the narrative of Frantz, because it was what he observed of the Tucker tow which is relied upon to vindicate his failure to blow an alarm.

■ The channel was about 400 feet wide and there was no other navigation then moving in these waters, and since the combined width of the tows did not exceed 115 feet, there was 285 feet of margin for clearance; of course there should have been no collision, and the fact that one occurred at all puts a heavy burden of explanation on both tugs.

It would be possible for Frantz to be mistaken as to the position of the Tucker tow when he first observed it, since he was looking across an expanse of water at night and undertook to place the position of the other tow at a distance from him of better than a mile.

Colligan says that he had no lookout on either the tug or the barge and, when he first saw the Socony 9, he observed her green starboard light but, because of the bend in the Kill, he could not tell then in which side of the channel the Socony tow was proceeding, and that he did not see the latter's red light until the said swing had been made and the collision was about to take place; and that he had expected a starboard passing with a 50-foot clearance and saw no reason for any whistle signal. Colligan didn't know that the Inland Rules applied, this being a narrow channel, and hence was unaware of his own duties; his faults were glaring and it is unnecessary to discuss that subject further.

Turning now to the testimony of Frantz, he is clearly correct in saying that at first he could see only the red light of the Tucker tow, and of course he changed his course gradually as he proceeded up the Kill, so as to pass Buoy No. 4 on his starboard hand,

and he says that it was not until he was about 300 feet below Buoy No. 4 that the Tucker tow showed a green light; then Frantz blew one whistle for a port passing, and he estimates the Tucker to have been about 1100 or 1200 feet away and on the New Jersey side of the channel. He says that he kept the Tucker tow in view and after about 15 seconds the latter's red light was shut out, and then Frantz blew three whistles and went full speed astern; that the bow of the Socony 111 passed practically 40 feet off Buoy No. 4 and then the Tucker hit the Socony 111 at a 110° angle across the bow; that is, the Tucker ran under the spoon-shaped bow of the barge; also that at the moment of impact the Socony tow had achieved sternway; he reasons that this must be so because the reverse movement of his own engine caused the Socony 111 to swing a little to her own port and prevented any striking between the L.T.C. barge and the Socony 111 because, in the absence of sternway, "she would have swung right under the bow of that barge too".

Frantz is no longer in the employ of the Socony-Vacuum Oil Company but is on its pension roll, and his testimony could be deemed biased only to the extent that he was vindicating his own navigation.

Rule III, Art. 18, of the Inland Rules, 33 U.S.C.A. § 203, is clear:

"If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

According to Frantz, he expected this to be a port passing (i. e. he did not fail to understand the course of the other tow) and had every reason so to expect, until he was about 300 feet from Buoy No. 4, when he first saw the Tucker's green light, and he estimates the distance that separated the tows at that time to be about 1200 feet. It was less than half a mile, and then he blew the one whistle for a port passing, which it will be recalled was not heard on the Tucker tow. Until that time, since the vessels were not approaching head and

head, there seems to have been no occasion for any whistle signal.

█ Within the language of the case of A. H. Bull S. S. Company v. United States, 2 Cir., 34 F.2d 614, at page 615, Column 2, the headings of these vessels, since both were in a winding course, were disclosed, and each must have been prepared in advance for the respective headings when the meeting took place; that is, the Tucker was charged with notice that the Socony 9 would round Buoy No. 4 and continue in a generally northeast direction, which would of course require a slight change in her helm as she proceeded up the Kill, and the Tucker was required to govern herself accordingly. The Socony 9 was required to navigate so as to effect a port passing.

It is now possible to form an opinion as to which side of the Kill was in fact being used by the Tucker prior to the one-whistle signal. If she had been coming down the Staten Island side from just off Port Reading as Colligan says, the tows would have been nearly head and head for better than 2000 feet and the Tucker's green light could have been seen from the Socony 9 for that distance, which means that passing signals should have been blown by both. The Tucker says she expected a starboard passing, but blew no whistle signal; the Socony 9 blew her one blast for a port passing only when she first deemed that to be necessary, namely, when the Tucker tow was about 1200 feet (1 minute) away, and that the necessity arose because the previously apparent course of the descending tow was altered. That is a plausible explanation to me, since Frantz on the whole (barring a certain consciousness of high personal rectitude) was a convincing witness, while Colligan seemed to be somewhat casual and aware that his own navigation had been likewise.

Moreover, his assertion that the turn of the upbound tow to its right was sharp (which was unnecessary and unlikely) in rounding Buoy No. 4, would be consistent with his apparent view during his own crossing ahead of her, rather than with what he would have observed, had he been keeping a steady course down the Staten Island side of the Kill; plus the fact that the Tucker tug was struck at her starboard quarter, rather than bows on.

I think that the Tucker tow, for some undisclosed reason, was not continuously in the waters on her port hand as she was proceeding down the Kill from Port Reading, but sought them at a time when it was impossible to do so successfully without change of course and at the speed she was making, and across the expectable course of the Socony tow.

These things being so, was it fault for the Socony 9 to blow three blasts and go astern when the tows were about 900 feet apart, instead of the alarm of four blasts or more? She waited 15 seconds for a reply to her first blast, which was probably overlong, by about 8 seconds. In that time, the distance separating the tows was reduced about 320 feet, and they were more than twice that distance apart when the three-whistle signal was blown to indicate that she was reversing her engines.

Suppose the Tucker had heard four or more short blasts, could she have avoided the collision? I venture to conclude that it would have made no difference whatever, since her Captain fled her cabin on hearing the signal that was given, without attempting any helm movement, or doing anything but signal to put his own engines in reverse.

█ Since the fault is not charged that there was too great an interval between the one and the three-blast signals, and no testimony was offered on the subject, the Court is not required to decide the matter. The criticism is confined to the difference between three and four blasts, and since I cannot see how that diminished the lack of care which characterized the navigation of the Tucker tow in the critical moments that preceded the collision, it follows that the Socony 9 cannot be held for even half damages.

Settle decrees in accordance with the foregoing, with one bill of costs. Findings are filed herewith.